THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BUILDING A BETTER BELLEVUE; and FRIENDS OF ENATAI,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>U.S. DEPARTMENT OF TRANSPORTATION, FEDERAL TRANSIT ADMINISTRATION; R.F. KROCHALIS, in his official capacity as the Regional Administrator of the FTA, Region X; U.S. DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION; and DANIEL M. MATHIS, in his official capacity as the Division Administrator, Washington Division, for the Federal Highway Administration,<br><br>　　　　　　　Federal Defendants,<br><br>　　and<br><br>CENTRAL PUGET SOUND REGIONAL TRANSIT AUTHORITY ("SOUND TRANSIT"),<br><br>　　　　　　　Interested Party. | CASE NO. C12-1019-JCC<br><br>ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |

ORDER GRANTING DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT
PAGE - 1

1   This matter comes before the Court on the parties' cross-motions for summary judgment
2   (Dkt. Nos. 24, 28–29). Having thoroughly considered the parties' briefing and the relevant
3   record, the Court finds oral argument unnecessary and hereby DENIES Plaintiffs' motion (Dkt.
4   No. 24) and GRANTS Defendants' motions (Dkt. Nos. 28–29) for the reasons explained herein.

I.   BACKGROUND

Central Puget Sound Regional Transit Authority ("Sound Transit") plans to construct an extension of its light rail transit system between Seattle and the east side of Lake Washington (the "East Link"). The East Link would cross Lake Washington and Mercer Island along U.S. Interstate 90 from Seattle to south Bellevue ("Segment A"), travel north from I-90 to downtown Bellevue ("Segment B"), continue through downtown Bellevue ("Segment C"), travel north to Overlake ("Segment D"), and finally connect Overlake to Redmond ("Segment E"). (AR 004527.) The stated purpose of the East Link project is "to expand the Sound Transit Link light rail system from Seattle to Mercer Island, Bellevue, and Redmond via I-90 in order to provide a reliable and efficient alternative for moving people throughout the region." (AR 004539.)



In connection with the East Link project, Sound Transit and Defendant Federal Transit Administration prepared a final environmental impact statement. The Federal Transit Administration found that the impact statement satisfied the requirements of the National Environmental Policy Act and that the project satisfied Section 4(f) of the Department of

ORDER GRANTING DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT
PAGE - 2

Transportation Act of 1966. (AR 011415, 011419, 011426, 011432–11434.) Defendant Federal Highway Administration then adopted the final environmental impact statement for purposes of that agency's required approvals. (AR 017137, 017141.)

Plaintiff Building a Better Bellevue is an association of Bellevue homeowners, residents, businesses, and neighborhood groups. (Dkt. No. 1 at 3 ¶ 10.) Plaintiff Friends of Enatai is an association of residents of South Bellevue neighborhoods along Bellevue Way and 112th Avenue SE between I-90 and Bellevue's Main Street, along the Mercer Slough Nature Park. (*Id.* at 4 ¶ 13.) In this action, Building a Better Bellevue and Friends of Enatai seek a declaratory judgment that the Federal Transit and Highway Administrations were arbitrary and capricious and failed to comply with federal law when they found that the East Link final environmental impact statement satisfied the requirements of the National Environmental Policy Act and that the project satisfied Section 4(f) of the Department of Transportation Act.

## II.   DISCUSSION

### A.   National Environmental Policy Act

The National Environmental Policy Act "is a purely procedural statute." *Neighbors of Cuddy Mountain v. Alexander* ("*Cuddy Mountain II*"), 303 F.3d 1059, 1070 (9th Cir. 2002). It "does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a 'hard look' at the environmental consequences of their actions." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (per curiam) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)) (quotation marks omitted). One aspect of that process is the mandated preparation of an environmental impact statement for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "The goal of [the Act] is two-fold: (1) to ensure that the agency will have detailed information on significant environmental impacts when it makes decisions; and (2) to guarantee that this information will be available to a larger audience." *Cuddy Mountain II*, 303 F.3d at 1063.

Courts assess the adequacy of an environmental impact statement under "a 'rule of reason' that does not materially differ from an 'arbitrary and capricious' review." *Id.* at 1071. The relevant inquiry is whether the impact statement contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.* ("*Cuddy Mountain I*"), 137 F.3d 1372, 1376 (9th Cir. 1998) (quotation marks omitted). If the court is "satisfied that an agency's exercise of discretion is truly informed, [the court] must defer to that informed discretion." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992) (quotation marks and indications of alteration omitted).

### 1. Failure To Address Reasonable Alternatives

An environmental impact statement "shall inform decisionmakers and the public of the reasonable alternatives [for a project] which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. It must "[r]igorously explore and objectively evaluate all reasonable alternatives"—*i.e.*, "alternatives that are 'reasonably related to the purposes of the project'"—and, "for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a); *League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012) (quoting *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004)). An impact statement's consideration of alternatives is sufficient "if it considers an appropriate range of alternatives, even if it does not consider every available alternative." *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1181 (9th Cir. 1990); *see Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978) ("[T]he 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man."). The Court reviews "both the choice of alternatives as well as the extent to which the . . . Impact Statement . . . discuss[es] each alternative" under a rule of reason. *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).

a.  **Segment B Tunnel Alternative**

The East Link final environmental impact statement discusses six alternatives for Segment B: five following Bellevue Way SE north from I-90, parallel to the western edge of the Mercer Slough Nature Park and to the residential communities of south Bellevue, and one continuing east parallel to I-90 on an elevated structure across Mercer Slough before turning north to run parallel to I-405 (the "B7" alternative). (AR 004652, 004659–4662.) All of the alternatives are above-ground.

Plaintiffs contend that a tunnel for Segment B was a seventh reasonable alternative that the environmental impact statement should have considered. Sound Transit's determination that such a tunnel was not a reasonable alternative was not arbitrary and capricious. Sound Transit considered and screened out a tunnel alternative during the scoping phase[1] of the project because it did not meet Sound Transit's criteria for tunnel candidates: locations with steep slopes, physical barriers, inadequate rights of way, building density, and high train frequencies. (AR 004646, 020705, 020227; *see* AR 004642 (explaining that the voter-approved funding package provides funds for at-grade or elevated alternatives).) A tunnel alternative would also have been more expensive, risky, and disruptive, undermining several goals of the project.[2] (AR 004646, 020705, 020227; *see* AR 004636 (discussing project's goals of providing financially feasible solution and reducing construction risk).) By contrast, Sound Transit is considering a tunnel for Segment C (through downtown Bellevue) because of the density of development and limited availability of rights of way, and because the City of Bellevue executed an agreement with Sound Transit to find additional funding sources to pay for the tunnel. (AR 020227, 004663, 004642 (explaining that the non-tunnel alternative for Segment C "is preferred if additional funding and scope reductions cannot be found to afford the tunnel").)

Nor did Sound Transit "fail[] to discuss and explain the reasoning behind eliminating consideration of a tunnel within the [impact statement] itself." (Dkt. No. 30 at 11.) The impact statement explicitly addresses why a tunnel was considered a reasonable alternative for some

---

[1] "The purpose of the scoping period is to notify those who may be affected by a proposed government action, which is governed by [the Act], that the relevant entity is beginning the [environmental impact statement] process. This notice requirement ensures that interested parties are aware of and able to participate meaningfully in the entire [impact statement] process, from start to finish." *Coalition for a Sustainable 520 v. U.S. Dep't of Transp.*, 881 F. Supp. 2d 1243, 1248–49 (W.D. Wash. 2012); *see* 40 C.F.R. § 1501.7.

[2] Plaintiffs' substanceless assertion that "[i]t is . . . reasonable to assume that a tunnel may be economical" (Dkt. No. 24 at 10; Dkt. No. 30 at 9) does not call into question the impact statement's operating assumption that tunnels involve substantially greater expense than above-ground builds.

1  segments (like Segment C) but not others (like Segment B). (AR 004646 (explaining that "[t]he
2  proposed route and station alternatives vary in profile as traveling at-grade . . . , in an elevated
3  configuration, or in a tunnel" and that, "[b]ecause of the conditions along the corridor, the East
4  Link Project is largely elevated or at-grade; however, tunnel alternatives were also considered in
5  Downtown Bellevue (Segment C)," and going on to describe the criteria for using tunnels).)
6  Thus, even if the concept of a tunnel *had* developed into a standalone alternative that was
7  nevertheless subsequently eliminated from detailed study, the environmental impact statement
8  would have satisfied 40 C.F.R. § 1502.14(a)'s requirement of a "brief[] discuss[ion]" of reasons
9  for eliminating it. But since Sound Transit eliminated the tunnel concept long before it became a
10 studied alternative, even that brief discussion was not necessary to comply with the Act.

11        Adding to the reasonableness of Sound Transit's decision not to include a Segment B
12 tunnel alternative in the final environmental impact statement is the fact that it also did not
13 include this alternative in the *draft* or *supplemental draft* impact statements, and of the hundreds
14 of comments it received on Segment B, none (including Plaintiffs') suggested that Sound Transit
15 reconsider a Segment B tunnel alternative.[3] "[T]he very purpose of a draft [environmental impact
16 statement] and the ensuing comment period is to elicit suggestions and criticisms to enhance the
17 proposed project." *Carmel-By-The-Sea*, 123 F.3d at 1156; *see Dep't of Transp. v. Pub. Citizen*,
18 541 U.S. 752, 764 (2004) ("[Parties] challenging an agency's compliance with [the Act] must
19 structure their participation so that it alerts the agency to the parties' position and contentions, in
20 order to allow the agency to give the issue meaningful consideration.") (quotation marks and
21 indications of alteration omitted). Had Plaintiffs objected to Sound Transit's failure to include a
22 Segment B tunnel alternative in the drafts, Sound Transit *might* have had reason to discuss that
23 alternative in the final impact statement. But no one objected; Sound Transit had already ruled
24 that alternative out; and it was therefore neither arbitrary nor capricious for Sound Transit not to

---

26     [3] One person advanced the distinct and infeasible concept of a tunnel for Segments B–E, based on his view of "the destruction of what trains do to an area." (AR 008968.)

ORDER GRANTING DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT
PAGE - 7

reintroduce it in the final impact statement.

In their reply, Plaintiffs move to supplement the record with a declaration prepared after the commencement of this litigation, purporting to show that Segment B meets Sound Transit's criteria for tunnel eligibility. The Court DENIES Plaintiffs' motion. Judicial review of agency actions is generally limited to the administrative record. *Nat'l Audubon Soc'y v. U.S. Forest Serv.*, 46 F.3d 1437, 1447 (9th Cir. 1993). "[C]ertain circumstances may justify expanding review beyond the record . . . ." *Id.* (quotation marks omitted). Two such circumstances include (1) when extra-record evidence is necessary to explain technical terms or complex subject matter and (2) when the agency has "swept stubborn problems or serious criticism under the rug." *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436–37 (9th Cir. 1988) (quotation marks and indications of alteration omitted). Plaintiffs argue the declaration should be admitted because it "addresses technical, complex subject matter that the agency 'swept under the rug.'" (Dkt. No. 30 at 6.) Not so. Early on in the scoping process, Sound Transit eliminated a tunnel alternative for Segment B because it determined that Segment B did not meet its (easy-to-understand) criteria for tunneling and would be riskier and more expensive. After that, no one resuscitated the tunnel idea, so there was no further analysis to be done—let alone to be "swept under the rug." Plaintiffs have not established the existence of circumstances creating an exception to the general rule that "[p]arties may not use post-decision information as a new rationalization either for sustaining or attacking the Agency's decision." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006) (quotation marks omitted).

### b.   B7R Alternative

While Sound Transit was preparing the supplemental draft environmental impact statement—and more than a year and a half after the draft environmental impact statement was issued—the City of Bellevue requested that Sound Transit consider a variation on the B7 alternative, called the "B7 Revised" alternative or "B7R." (AR 004640.) The two alternatives are similar, the chief differences being the location of a new station and parking garage. (AR

ORDER GRANTING DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT
PAGE - 8

005232.) The final environmental impact statement does not consider B7R as a standalone alternative; instead, it compares B7 to B7R in detail (AR 004576–4577, 004670, 005231–5236; *see* 011365–11414) and concludes:

> With mitigation, B7R would result in improved traffic operations along Bellevue Way SE compared with B7 which does not affect or change this roadway. B7R would have greater residential displacements, property acquisition, visual, noise, park, and ecosystem impacts than B7 []. But, B7R would have less business and employee displacements than B7 []. The B7R [] Station parking garage would result in visual impacts and require residential acquisitions, while the 118th Station for B7 requires business displacements. Like B7, the B7R Mercer Slough Nature Park impacts are in areas of wetlands and wetland buffer. B7R would be on a retained fill on the east side of Sturtevant Creek, requiring relocation of the creek. Construction of B7R may result in higher ecosystem impacts along Mercer Slough, the wetland areas surrounding the slough and Sturtevant Creek than B7 [].

(AR 004576–4577.) The impact statement also observes that ridership within Segments B and C, and project-wide, would be 12,500 and 50,500, respectively, with B7R, and 10,500 and 49,000, respectively, with B7, and that "the B7R modifications increase the project cost [by] approximately $10 to $14 million [over] . . . B7." (AR 004576–4577.)

Plaintiffs argue that the impact statement fails to adequately consider B7R. But the detailed discussion of B7R versus B7 is more than sufficient to satisfy 40 C.F.R. § 1502.14(a)'s requirement of a "brief[] discuss[ion]" of reasons for not considering B7R as a standalone alternative. As the quoted text shows, B7R was not a clear winner over B7; it was better in some respects and worse in others. It was entirely reasonable, then, to compare only B7, and not also B7R, to the other six Segment B alternatives in determining the preferred Segment B alignment. *See Westlands*, 376 F.3d at 871–72 (9th Cir. 2004) (Act does not require agency to consider "every conceivable permutation" of alternatives); *Headwaters*, 914 F.2d at 1181 (agency need not undertake "separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences"); *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) (agency need not "discuss alternatives similar to alternatives actually considered"); *see, e.g.*, *Laguna Greenbelt, Inc. v. U.S.*

*Dep't of Transp.*, 42 F.3d 517, 524 (9th Cir. 1994); *520*, 881 F. Supp. 2d at 1256–57. The alternatives set forth in the impact statement, supplemented with a detailed discussion of B7R, "permit a reasoned choice" and an agency "hard look," and are sufficient to satisfy the Act. *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982).

          **c.**     **Alternatives to Light Rail**

Plaintiffs also complain that Sound Transit failed to consider any modes of high-capacity transit other than light rail. But the stated purpose of the project is to "[e]xpand the Sound Transit Link light rail" to the east side. (AR 004625.) Plaintiffs respond that, by confining the purpose to expanding the light rail—as opposed to high-capacity transit generally—Sound Transit "unreasonably avoided consideration of other transit modes, such as bus rapid transit," that might have had fewer environmental impacts. (Dkt. No. 24 at 13.)

This argument is a non-starter. The choice of light rail over bus service was the result of years of analysis and deliberation. (AR 004635–4636 (describing the process leading to "Identification of Light Rail as the Preferred Mode"), 011416–11418.) A 2004 assessment deemed bus rapid transit, light rail transit, and monorail appropriate for the east corridor. (AR 004635.) Around the same time, in connection with updating its long-range plan, Sound Transit analyzed potential high-capacity transit projects, implementing an "extensive public outreach process" to consider the alternatives. (*Id.*) In 2005, the board adopted an updated long-range plan, which identified light rail and rail-convertible bus rapid transit for further consideration. (*Id.*) It then directed staff to conduct additional analyses and feasibility and traffic studies, and based on the results, "identified light rail as the preferred [high-capacity transit] transportation mode for the East Corridor" in July 2006:

> The Sound Transit Board identified light rail because it provides the benefits of operating in an exclusive right-of-way separated from general-purpose and HOV traffic. . . . Light rail in the East Corridor would [also] use the same technology as the Central Link line and build on that investment. It would provide a higher level of system integration by interlining directly with the Central Link line and providing a direct ride between the Eastside, Downtown Seattle, and the North

ORDER GRANTING DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT
PAGE - 10

>Corridor stations . . . . Light rail provides the highest level of ridership and the shortest travel times of all technologies evaluated in the corridor.

(AR 004635–4636.) In July 2008, Sound Transit adopted "ST2," known as the mass transit expansion proposal, a package of high-capacity transit investments in the regional transit system that includes the East Link project. (*Id.*) Voters approved ST2 in November 2008. (*Id.*)

Sound Transit's decision to confine the purpose of the East Link project to expanding the light rail system was anything but arbitrary. To the contrary, it was the result of a long, careful, and deliberative process, and the light rail-specific purpose responds precisely to the transportation problems that needed to be solved. *See* 23 C.F.R. § 450.212(a)(1) (allowing agency to use planning processes of state and local transportation authorities to narrow and focus purpose and need statements);[4] *see, e.g.*, *Carmel-By-The-Sea*, 123 F.3d at 1155–57 (rejecting Plaintiffs' argument that the agency "preordained . . . the preferred choice" by "unjustifiably narrow[ing] its statement of 'Purpose and Need,'" observing that the agency's goal was "legitimate" and reasonable because it directly responded to the identified needs to "significantly alleviate traffic congestion, reduce accidents and achieve other transportation goals"; "[t]hat the Federal Highway Administration and Caltrans viewed Level of Service C as important and as the most plausible project goal given the severe traffic problems along this stretch of Highway 1 cannot be said to be unreasonable simply because Level of Service D would have been a 'tolerable' alternative"). Because confining the purpose of the East Link to expanding light rail was reasonable, the environmental impact statement was not required to study alternatives—like bus rapid transit—that did not meet that purpose. *See City of Angoon v. Hodel*, 803 F.2d 1016,

---

[4] Plaintiffs argue that "the local transportation planning process relied upon to limit the purpose of the project to light rail took place prior to the 2007 adoption of 23 C.F.R. § 450.212" and that "[n]othing in the 2007 regulations allows for retroactive application." (Dkt. No. 30 at 19.) That the regulations explicitly approved the use of local planning processes to narrow an impact statement's purpose and need statements in 2007 does not mean that, prior to 2007, such use was impermissible. In any event, the draft impact statement was issued in December 2008, and the final impact statement was issued and approved in 2011—well after the regulations authorized use of local planning studies to produce purpose and need statements.

ORDER GRANTING DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT
PAGE - 11

1021 (9th Cir. 1986).

### 2. Failure To Consider Cumulative Impact of Extending Light Rail to Issaquah

An environmental impact statement must consider the cumulative impact of the proposed action: "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. "[R]easonably foreseeable actions . . . include proposed actions." *Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1010 (9th Cir. 2011) (quotation marks and indications of alteration omitted). For example, when an agency issues a notice of intent to prepare an impact statement for an action, "[the] action is not too speculative to qualify as a proposed action . . . ." *Id.* (quotation marks omitted). On the other hand, when an action "could conceivably" occur but "it is at least as likely that it will never" occur, the "future activity is not reasonably foreseeable," and its possible cumulative effects need not be considered. *Headwaters*, 914 F.2d at 1182. Courts "defer to an agency's determination of the scope of its cumulative effects review." *Cuddy Mountain II*, 303 F.3d at 1071.

Plaintiffs argue that the environmental impact statement should have discussed the cumulative effect of the East Link project *and* a possible future project extending the light rail to Issaquah. They point out that one possible alignment for such an extension would connect the extension to the East Link around I-90 and Bellevue Way SE and continue east along the southern boundary of the Mercer Slough (as B7 and B7R would do). If such an extension were ultimately constructed, they argue, then the southern boundary of the Mercer Slough would eventually be impacted anyway, and so the East Link environmental impact statement should prefer B7 or B7R over the other Segment B alternatives, since B7 and B7R *also* run along the southern boundary, whereas the other Segment B alternatives run parallel to the *western* boundary, as well as impact the Winters House and Surrey Downs Park (discussed *infra*).

An Issaquah extension that runs along the southern boundary of the Mercer Slough is not

ORDER GRANTING DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT
PAGE - 12

a reasonably foreseeable proposed action, and so the environmental impact statement appropriately did not consider it. The Issaquah extension is the subject of a preliminary study funded by ST2 that has not yet commenced. (AR 019886.) Voters would have to approve an ST3 or ST4 funding package before Sound Transit would even start seriously considering potential alternatives and alignments. Even assuming the Issaquah extension were ultimately planned, approved, permitted, and funded—a big if—it may not cross the Mercer Slough at the southern boundary—and thus may not strengthen the case for B7 or B7R. (AR 020614, 020617–20618.) In other words, such an alignment "could conceivably" be built, but "it is at least as likely that [that alignment] will never" be built, and that Sound Transit will choose an alternative alignment. *Headwaters*, 914 F.2d at 1182. The Issaquah extension—and the particulars about how it might connect to the preexisting light rail system—are far too speculative and uncertain to merit consideration in the East Link impact statement's cumulative effects analysis.

### 3.     Failure To Adequately Identify Mitigation for Affected Wetlands and Wetland Buffers

The Act "requires only that an [impact statement] contain 'a reasonably complete discussion of possible mitigation measures.'" *Kempthorne*, 457 F.3d at 979 (quoting *Robertson*, 490 U.S. at 352). It need not contain a "complete mitigation plan [that is] actually formulated and adopted," *Robertson*, 490 U.S. at 352, and the mitigation plan may be "conceptual" and remain "flexible to adapt for future problems," *Carmel-By-The-Sea*, 123 F.3d at 1154; *see, e.g.*, *Laguna Greenbelt*, 42 F.3d at 528 (discussion of impacts and "potential" and possibly unsuccessful mitigation measures satisfies the Act). "[I]t would be inconsistent with [the Act's] reliance on procedural mechanisms—as opposed to substantive, result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act." *Robertson*, 490 U.S. at 353.

The East Link environmental impact statement sufficiently discusses possible mitigation measures to ensure that the agency fairly evaluated the project's environmental consequences.

Sound Transit commits in the impact statement to achieving no net loss of wetland function and area on a project-wide basis. (AR 005018, 010624.) Its plan for doing so is to apply interagency wetland mitigation guidance to identify compensatory mitigation sites—a proven wetlands mitigation method—within the same drainage basin as the affected areas and to compensate for lost functions in-kind. (AR 005018.) Although there are no existing approved mitigation banks in the Kelsey Creek subbasin—a subbasin affected by the project—"[d]uring field work, Sound Transit determined there are several opportunities for wetland mitigation within the study area close to potentially impacted areas that are expected to meet required mitigation ratios," and Plaintiffs have pointed to no evidence showing that Sound Transit's expectations are unreasonable. (*Id.*; *see also* AR 010626 (discussing four potential approaches to achieving wetlands mitigation goal).) Finally, the Federal Transit Administration has made mitigation achieving zero net wetlands loss a condition of its approval of the project and is requiring that Sound Transit establish a monitoring plan to ensure the effectiveness of its mitigation measures. (AR 011424–11425, 011430, 011478.) The impact statement's commitment to zero wetlands loss, made credible with a plan to use already-identified opportunities for compensatory mitigation, and by the Federal Transit Administration's conditioning approval of the project on achieving that commitment, is sufficient to "ensure that environmental consequences have been fairly evaluated." *Robertson*, 490 U.S. at 352. The Act requires nothing more. *See, e.g.*, *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 476 (9th Cir. 2000) (that impact statement's discussion of "procedures for ensuring compliance with applicable water-quality standards . . . are stated in somewhat general terms" does not render them "deficient" under the Act); *Carmel-By-The-Sea*, 123 F.3d at 1154 (upholding "proposed mitigation plan [that] is intended to be 'conceptual' only"); *compare, e.g.*, *Cuddy Mountain I*, 137 F.3d at 1381 (impact statement deficient where it "did not discuss which (or whether) mitigating measures might decrease the increased sedimentation in the three creeks affected by the timber sale," "suggest[ed] that the [agency] did not even consider mitigating measures for the creeks actually

affected by the sale," and failed to "provide[] an estimate of how effective the mitigation measures would be if adopted, or give[] a reasoned explanation as to why such an estimate is not possible," and where "it [wa]s also not clear whether any mitigating measures would in fact be adopted").

In reviewing Plaintiffs' challenges to the environmental impact statement under the National Environmental Policy Act, the Court may not "substitute [its own—or Plaintiffs'—] judgment for that of the agency concerning the wisdom or prudence of [the] proposed action." *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987). The Court's role is limited to ensuring that the agency took a hard look at a reasonable range of alternatives whose impacts on the environment were discussed in sufficient detail to render the agency's decision informed. The final environmental impact statement here meets that standard.

### B. Department of Transportation Act Section 4(f)

Section 4(f) of the Department of Transportation Act of 1966 provides:

> [T]he Secretary may approve a transportation program or project . . . requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance . . . only if—
>
> (1) there is no prudent and feasible alternative to using that land; and
>
> (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

49 U.S.C. § 303(c). Section 4(f) thus requires a two-phase inquiry: First, the agency determines whether there are any feasible and prudent "avoidance alternatives" to the taking of protected property. 23 C.F.R. § 774.3(a)(1). If no avoidance alternative is available, the agency must approve the alternative that "[c]auses the least overall harm in light of the statute's preservation purpose" by balancing seven factors. 23 C.F.R. § 774.3(c)(1).

Here, the Federal Transit Administration issued a record of decision, adopting the final


environmental impact statement's preferred alignments for Segments B and C. (AR 011415–11854.) Those selected alignments impact the following Section 4(f) resources: (1) the Mercer Slough, a 320-acre park characterized by wetland systems and upland habitat (AR 005134), (2) the Winters House, a National Registry of Historic Places property located in the Mercer Slough (AR 005117), and (3) Surrey Downs Park, which contains athletic fields, play structures, internal trails, open space, remnant stands of heritage filbert trees, and the King County District Courthouse (AR 005134–5135). The agency determined that "no project alignment alternative provided a prudent and feasible alternative that avoids all [Section 4(f)] resources" and that the environmental impact statement identified all reasonable measures to cause the least overall harm to those resources. (AR 011433; *see* AR 011433–11434, 005354–5358.) The agency did not analyze the B7R alternative in its Section 4(f) evaluation because the proposal was not sufficiently formulated when the environmental impact statement and Section 4(f) analysis were prepared. (AR 005374.) The City of Bellevue and the Department of the Interior reviewed the agency's least-harm analysis and concurred with its conclusions. (AR 011631–11632, 015071–15072.)

Plaintiffs claim that the Federal Transit Administration's Section 4(f) analysis was "arbitrary and capricious." First, Plaintiffs argue that, "[b]y failing to take a hard look at a Segment B tunnel alternative, the Section 4(f) analysis failed to consider a feasible and prudent alternative that would avoid use of Section 4(f) resources." (Dkt. No. 24 at 22.) But because Sound Transit rejected the tunnel alternative during scoping, it was not a feasible and prudent 4(f) alternative that the agency was required to consider. *See 520*, 881 F. Supp. 2d at 1259 ("Section 4(f) does not require that the agency 'circle back' to reconsider an option that it has already ruled out as imprudent.") (quoting *Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. Fed. Aviation Admin.*, 651 F.3d 202, 213 (1st Cir. 2011)). In any event, Plaintiffs' assertion that a tunnel-based alternative would *not* use Section 4(f) resources is entirely conclusory. Indeed, in their reply, they assert that "[a] tunnel alignment would eliminate

impacts to Section 4(f) resources, including at least the Winters House and Surrey Downs Park"—thus apparently conceding that it would not necessarily avoid the Mercer Slough. (Dkt. No. 30 at 27; *see also* Dkt. No. 24 at 10 (asserting that "[a] tunnel alternative would [only] *likely* avoid impacts to many Section 4(f) resources") (emphasis added).)

      Plaintiffs next argue that B7 and B7R are "avoidance alternatives" to the preferred and adopted Segment B alignment, since B7 and B7R, unlike the adopted alignment, would completely avoid use of the Winters House and Surrey Downs Park. The agency did not see it this way. In its view, since *all* the Segment B alternatives (including B7 and B7R) impacted the Mercer Slough in one way or another, none of the alternatives was an "avoidance alternative"—*i.e.*, an alternative that avoided use of 4(f) properties altogether—and so the agency proceeded to the second phase of the inquiry and approved one of the alternatives that caused the "least overall harm." The agency's decision not to treat alternatives that would use the Mercer Slough as avoidance alternatives was neither arbitrary nor capricious. *See* 23 C.F.R. § 774.17 (defining "feasible and prudent avoidance alternative" as an alternative that "avoids using Section 4(f) property," and describing the § 774.3(a)(1) avoidance alternative analysis as one that "search[es] for feasible and prudent alternatives that *avoid Section 4(f) properties altogether*") (emphasis added). What *is* arbitrary is *Plaintiffs'* proposed 4(f) analysis—which would count an alternative as an "avoidance alternative" because it avoids some, but not all, Section 4(f) properties, thus immunizing it from a "least overall harm" comparison with the other alternatives. *See, e.g.*, *Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin.*, 772 F.2d 700, 715 (11th Cir. 1985).

      Plaintiffs next argue that, even if B7 and B7R are not "avoidance alternatives," "the [agency]'s conclusion that the preferred . . . alternative would result in less harm to Section 4(f) resources than [the B7 or B7R] alternatives . . . arbitrarily failed to balance in favor of preservation and instead skewed the balance in favor of a possible slight increase in ridership and slight decrease in cost." (Dkt. No. 24 at 23.) First, as discussed, the agency did not consider the B7R alternative in its Section 4(f) analysis because the proposal was not sufficiently formulated

when the final environmental impact statement and Section 4(f) analysis were prepared. As for B7, a review of the agency's analysis belies Plaintiffs' contention that the agency arbitrarily tipped the Section 4(f) factors against that alternative. The agency carefully considered the seven factors: Using the seven criteria, it prepared a matrix examining all possible permutations of Segment B and C options for a total of thirty-five alternatives. (AR 005361, 005385–5390.) From those thirty-five options, it identified eleven that caused the least overall harm, and it chose its preferred alignments for Segments B and C from among those eleven. (AR 005384.)

B7 was not among the eleven "least harmful" options. That is because the combinations of B7 with the various Segment C alternatives were generally more expensive and less accessible, and significantly reduced ridership in Segments B and C, thus scoring lower on the factor of "degree to which each alternative meets the purpose and need for the project" and, at best, no better on the factor of "[s]ubstantial differences in costs among the alternatives." 23 C.F.R. § 774.3(c)(1)(v) & (vii). (AR 005375, 005378–5381, 005383.) The B7 combinations also scored equally to or lower than other Segment B options on "[t]he ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property)" and "[t]he relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection." *Id.* § 774.3(c)(1)(i) & (ii). That is because, while B7's impact on the Mercer Slough could not be mitigated to create a net benefit, other Segment B alternatives allowed for a plan to add to the Mercer Slough up to three acres of land to replace the land permanently occupied by the project, which is projected to yield a net *benefit* to the park.[5] (AR 005362–5365, 005367–5368.) Similarly, post-mitigation, some non-B7 alternatives would "have a net benefit to Surrey Downs Park" by "removing the King County District Courthouse and replacing the site with landscaped

---

[5] As discussed *supra*, the expected net benefit to the Mercer Slough from compensatory mitigation is not, contrary to Plaintiffs' contention, "unfounded," "conclusory," or "speculative." (Dkt. No. 30 at 5, 30–31.)

ORDER GRANTING DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT
PAGE - 18

1 park grounds"—something the B7 combinations could not offer. (AR 005366, 005368.) And
2 post-mitigation, non-B7 alternatives (unlike B7) are projected to yield a net benefit to the
3 Winters House by providing "more historically appropriate landscaping" and "new interpretive
4 signage." (AR 005367–5368.)

5     Plaintiffs appear to believe that the only acceptable outcome of the Section 4(f) analysis
6 was the emergence of B7 as the winner, since B7 would permanently impact fewer acres of the
7 Mercer Slough and avoid any impact to the Winters House and Surrey Downs Park. But
8 permanent, un-mitigated impact is not a factor for consideration under 23 C.F.R. § 774.3(c).
9 Without exception, the § 774.3(c) factors direct the agency to consider *post*-mitigation impact,
10 including any resulting net benefits. *Id.* § 774.3(c)(1)(i), (ii) & (vi). And as discussed, post-
11 mitigation, the B7 alternatives fared no better than the non-B7 alternatives, and in some cases
12 fared worse because they were not projected to yield a net benefit. Thus, even if, as Plaintiffs
13 contend, "the balance must always be struck in favor of preservation of the Section 4(f)
14 properties" and "the balance must . . . give paramount importance to preservation" (Dkt. No. 30
15 at 28, 30), there is no indication that the agency failed to strike the balance in favor of
16 preservation here.

17     Finally, for the same reasons the environmental impact statement was not required to
18 consider the cumulative impact of the possible Issaquah extension—with its possible alignment
19 along the southern boundary of the Mercer Slough—the agency was not required to consider that
20 impact in its Section 4(f) evaluation.

21 **III.   CONCLUSION**

22     For the foregoing reasons, the Court GRANTS Sound Transit's and Defendants' motions
23 for summary judgment (Dkt. Nos. 28–29) and DENIES Plaintiffs' motion for summary judgment
24 (Dkt. No. 24).
25 //
26 //

1  DATED this 7th day of March 2013.

2

3

4

5

6

7

        John C. Coughenour
8          UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER GRANTING DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT
PAGE - 20